# In the United States Court of Federal Claims

No. 25-1664
(Filed Under Seal: September 28, 2026)
(Reissued for Publication: October 15, 2026)[1]

| | |
|---|---|
| MVL USA, INC., Plaintiff, | * |
| v. | * |
| THE UNITED STATES, Defendant. | * |

*Joseph L. Cohen*, Burr & Forman LLP, Chicago, IL, counsel for Plaintiff. With whom were *Kelsey M. Hayes*, and *David P.J. Timm,* Washington, DC, of counsel.

*Alexander S. Brewer,* U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Lt Col Jeffrey Hannon*, Department of the Air Force, of counsel.

**OPINION AND ORDER**

**DIETZ, Judge.**

MVL USA, Inc. ("MVL") protests a decision by the United States Department of the Air Force ("Air Force") to award indefinite delivery/indefinite quantity ("IDIQ") contracts to twelve offerors under Request for Proposal ("RFP") No. FA890324R0023 for the worldwide Comprehensive Construction & Engineering ("C2E") multiple award task order contract ("MATOC"). MVL argues that the Air Force relied upon an inadequately supported independent government estimate ("IGE"), that the Air Force conducted a flawed price reasonableness analysis, and that the Air Force failed to conduct a proper unbalanced pricing analysis. For the reasons set forth below, the Court finds that the Air Force's IGE had a rational basis, but that its price reasonableness analysis was arbitrary and prejudicial, and that its unbalanced pricing analysis was arbitrary and contrary to law but not prejudicial. Accordingly, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** MVL's motion for judgment on the administrative record ("MJAR"), [ECF 34], and **GRANTS-IN-PART** and **DENIES-IN-PART** the government's cross-MJAR, [ECF 38].

---

[1] This Opinion and Order was filed under seal on September 28, 2026, *see* [ECF 50], in accordance with the Protective Order entered on December 12, 2025, *see* [ECF 18]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on October 7, 2026, with proposed redactions. [ECF 52]. The Court accepts the parties' proposed redactions. All redactions are indicated by bracketed asterisks, e.g., "[* * *]."

## I. FACTUAL BACKGROUND

On July 27, 2023, the Air Force held an acquisition strategy panel to discuss the C2E requirement. AR 467.[2] In the panel briefing slides, the Air Force stated that the C2E requirement "is a follow-on IDIQ that continues to satisfy existing/ongoing requirements to support design and construction of new facilities [and] infrastructure; [and to] repair, renovate and/or restore existing facilities and infrastructure[.]" AR 473. The briefing explained that the impending expiration of the then-existing Regional Engineering and Construction ("RE&C") and Worldwide Engineering and Construction ("WE&C") contract vehicles necessitated the development of the C2E requirement. *See* AR 473.

In July 2024, the Air Force issued the RFP for the C2E requirement as a best value procurement pursuant to Federal Acquisition Regulation ("FAR") Part 15. AR 745, 891-92. It was amended six times. AR Tabs 15-20.[3] The RFP included a potential ten-year period of performance with a base ordering period of five years and five one-year option periods. AR 1658. According to the RFP, the Air Force "intend[ed] to make twelve (12) awards" to offerors in the full and open ("F&O") competition category.[4] AR 1633. The RFP described its evaluation methodology as follows:

> The [Air Force] will utilize a highest technically rated offeror [("HTRO")] methodology. The HTRO method requires the offeror to score itself based on the objective criteria described in Section L – Instructions, Conditions, and Notices to Offerors or Respondents. The offerors' proposals will be ranked based on initial self-scoring in the offeror completed Section L, Appendix L-05, which includes weighting for each factor. The [Air Force] will sort all proposals from the highest self-rated offeror to the lowest self-rated offeror. The [Air Force] will validate the highest proposed self-scores to fulfill . . . the F&O awards. If an offeror's self-score is downward adjusted because of [Air Force] validation, and the offeror is no longer among the highest rated offerors, then the [Air Force] will validate the next highest self-rated offeror, until . . . the F&O awards are fulfilled with the highest government-validated scores (see paragraph 4.0 of this Section M). The [Air Force] will evaluate for small business participation acceptability (F&O Only) (see paragraph 5.0 of this Section M) and price reasonableness, completeness, and balance (see paragraph 6.0 of this Section M). If an offeror is found unacceptable in small business participation or is found to have unreasonable, incomplete or unbalanced pric[ing], the

[2] The Court cites to the administrative record filed by the government at [ECFs 21, 30, 35, 41, 44] as "AR ___" and cites to tabs within the administrative records as "AR Tab ___." When quoting from the administrative record, the Court omits unnecessary capitalization.

[3] The Court cites Amendment 0005 when discussing Section M of the RFP because Amendment 0006 does not include Section M. *See generally* AR Tab 20.

[4] The RFP also contemplated making fifteen awards to offerors in the small business set aside category. AR 1632.

> [Air Force] will validate the next highest self-rated offeror and then evaluate that offeror for small business participation acceptability and price reasonableness, completeness, and balance.
>
> * * *
>
> [T]he F&O offerors with a combination of the HTRO, past experience ratings and a complete, balanced, and reasonable price will represent the best value to the government.

AR 1635. The RFP also stated that the Air Force will conduct "an integrated assessment of the proposals, . . . [however,] the [HTRO] evaluation methodology is not a tradeoff." AR 1632. It further explained that the Air Force, "either without discussions or after discussions occur, will award basic contracts . . . [to] the F&O offerors with a combination of the HTRO, past experience ratings and a complete, balanced, and reasonable price[.]" AR 1635.

The instant protest relates to the Air Force's evaluation of price under the RFP—specifically its analysis of price reasonableness and price balance. Regarding the price factor, the RFP stated that the Air Force "will evaluate the proposed [Total Evaluated Price ("TEP").]" AR 1638. It explained that "[t]he TEP is automatically calculated in Appendix L-08 Labor Rates Table when proposed [not-to-exceed ("NTE") firm-fixed-price ("FFP")] fully burdened labor rates are entered in the applicable cells." *Id.*; *see also* AR 1758, 1773, 1775 (requirement to submit proposed hourly labor rates for all labor categories in Section L Appendix L-08 Labor Rates Table). Upon entry of the proposed NTE FFP fully burdened labor rates by the offeror, "the hours provided by the [Air Force] are multiplied by the . . . labor rates for the predetermined mix of labor categories across all years of the ordering periods[.]" AR 1638. "The sum of these hours applied to the offeror's proposed . . . labor rates for each labor category across all years determines the TEP." *Id.* The RFP advised that "the [labor] rates proposed by the offeror will become contractually binding . . . should the offeror be awarded a contract." *Id.* It further stated that the "labor rates are ceiling rates and shall be utilized for future competitive task orders, single-source task orders, and task order modifications that utilize fixed-price pricing structure; however, when competing for task orders, discounted or lower rates may be proposed." *Id.*

Regarding price reasonableness, the RFP stated that the Air Force "will evaluate the proposed [TEP] for reasonableness using the techniques described in FAR 15.404-1," AR 1639, and that "[g]enerally, the government may rely upon adequate price competition to establish fair and reasonable price and may use adequate price competition as the basis for the fair and reasonable price determination at both the IDIQ and [task order] levels," *id.* It further stated that, "[f]or the [Air Force] to determine a TEP to be reasonable, the TEP must represent a price . . . that does not exceed the price a prudent person would pay in the conduct of competitive business." *Id.* Regarding price balance, the RFP "cautioned against submitting an unbalanced offer," AR 1638, and stated that the Air Force "will analyze offers to determine whether they are unbalanced with respect to price," *id.* The RFP further stated:

> Per FAR 52.215-1(f)(8), the [Air Force] may determine that a proposal is unacceptable if the prices proposed are materially

> unbalanced between line items or subline items. Unbalanced pricing exists when, despite an acceptable [TEP], the price of one or more contract line items is significantly overstated or understated as indicated by the application of cost or price analysis techniques. The [Air Force] may also consider an offer unbalanced if there is a significant difference between proposed prices from year to year, including option years, such that they are above or below what would be considered a reasonable adjustment for inflation. A proposal may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the [Air Force].

AR 1638-39.

On November 7, 2024, the Air Force received nineteen proposals in response to the RFP. AR 18046. Once the Air Force completed its initial evaluations, it determined that "[d]iscussions were required to have enough offerors [found] acceptable for [small business participation] as originally only four of the [sixteen] evaluated proposals were acceptable." AR 16448. Because "all proposals had prices that were complete, balanced and reasonable, . . . price was not a part of the discussions." *Id.* Discussions occurred from May 22, 2025, through August 5, 2025. *Id.* Thereafter, the Air Force "tentatively determined [that MVL's small business participation was] acceptable," AR 16434, and it ranked MVL thirteenth out of sixteen proposals, AR 16410, 16442-43.

On August 14, 2025, the offerors submitted final proposal revisions. AR 18046. After evaluating the final proposals, the Source Selection Evaluation Board ("SSEB") concluded that all the proposed pricing was "evaluated and determined to be complete, balanced, and reasonable by the pricing analyst and the [contracting officer]." AR 18133. The SSEB also concluded that all the proposals were acceptable under the small business participation factor, except MVL's proposal. *Id.* According to the SSEB, "MVL omitted the required information in their [small business subcontracting plan] that they had previously submitted in discussions [and that] [t]herefore, the MVL small business subcontracting plan is determined unacceptable." *Id.* However, the SSEB noted that "[i]f MVL were considered within the HTRO and therefore, an 'apparently successful offeror[,'] this error in the small business subcontracting plan could be remedied as part of the contracting officer's responsibility determination process." *Id.* Thereafter, "[t]he SSEB recommend[ed] award to the top [twelve] [HTROs] with acceptable small business participation and complete, balanced, and reasonable pric[ing]." AR 18134. The SSEB's recommendation did not include MVL, *id.*, which finished fourteenth in the final validated scores, AR 18078.

Next, the Source Selection Advisory Council ("SSAC") "reviewed the SSEB's evaluation and findings to ensure their accuracy, consistency, and supportability in accordance with the evaluation criteria" and concurred with the evaluation and findings. AR 18135. The SSAC unanimously recommended that the top twelve offerors receive contract awards. *Id.* The Source Selection Authority then conducted an "extensive review of the documentation and [consulted] with the [SSAC], [SSEB], and [his] advisors [and] determined that the proposals submitted by

the [] [twelve] [HTRO] . . . represent the best value to the Air Force as described in the C2E [RFP].” AR 16446.

On September 22, 2025, the Air Force issued a debriefing to MVL. AR 18033. In the debriefing, the Air Force informed MVL that it “was not selected for award,” *id.*, because its “proposal[] ranked [fourteenth] out of the validated offerors,” AR 18034. Shortly thereafter, the Air Force issued contracts to the twelve HTROs. AR 16536 (executed contract for ECC Expeditionary Constructors LLC); AR 16666 (same for Gilbane Federal JV); AR 16796 (same for Tutor Perini Corporation); AR 16843 (same for CMS COLAS Construction LLC); AR 17053 (same for CDM Constructors Inc.); AR 17184 (same for Flatiron Dragados Constructors, Inc.); AR 17314 (same for Parsons Government Services Inc.); AR 17361 (same for Contrack Watts Inc.); AR 17573 (same for SSLSCO, Ltd.); AR 17704 (same for Bering-Weston JV, LLC); AR 17835 (same for Exp Federal Inc.); AR 17966 (same for Hensel Phelps Construction Co.).

## II. PROCEDURAL HISTORY

On October 6, 2025, MVL filed a complaint in this court challenging the Air Force’s award decision. Compl. [ECF 1]. The Court held an initial status conference on October 8, 2025. *See* [ECF 6]. During the conference, MVL stated that it would not seek preliminary injunctive relief “unless the [Air Force] issues a material task order with a value exceeding $35,000,000.” [ECF 7]. Additionally, the government advised “that it planned to file a motion to stay the proceedings in this case due to the lapse in appropriations” to fund the Department of Justice, which MVL did not oppose. *Id.* As part of its motion to stay, the government “agreed to provide additional details on the status of the [C2E] procurement . . . , including the potential for a voluntary stay in contract performance.” *Id.*

On October 10, 2025, the government filed an unopposed motion to stay the case. [ECF 8]. In its motion, the government stated the following:

> The . . . Air Force does not anticipate awarding any task order under the [C2E] worldwide [IDIQ] [MATOC] during the pendency of the lapse in appropriations. If the . . . the Air Force intends to award a task order greater than thirty-five million dollars ($35,000,000.00) to any C2E MATOC awardee under the C2E MATOC during the pendency of the lapse in appropriations, the government will notify [MVL] prior to award.

*Id.* at 2.[5] The Court granted the motion to stay. [ECF 9]. On November 14, 2025, the government informed the Court that appropriations had been restored, [ECF 10], and on November 17, 2025, the Court lifted the stay and ordered the parties to file a joint status report with a proposed schedule for further proceedings.

[5] The Court cites to the filings on the docket using the page numbers generated by the CM/ECF system. When quoting from the filings on the docket, the Court omits unnecessary capitalization.

On December 2, 2025, the parties filed a joint status report with a proposed briefing schedule. [ECF 14]. The parties also agreed on the following regarding a voluntary stay of performance:

> The . . . Air Force may award a task order under the [C2E] worldwide [IDIQ] [MATOC] to any small business set-aside awardees during the pendency of these proceedings. If the . . . Air Force intends to award a task order greater than thirty-five million dollars ($35,000,000) to a[n] [F&O] competition C2E MATOC awardee under the C2E MATOC during the pendency of these proceedings, the government will notify [MVL] reasonably in advance of making an award.

*Id.* at 2. The Court adopted the proposed schedule on December 5, 2025. [ECF 15]. The government filed an unopposed motion to amend the schedule on January 5, 2026, to request additional time for filing the administrative record. [ECF 19]. The next day, the Court granted the requested additional time and adopted the revised schedule. [ECF 20]. The government filed the administrative record on January 20, 2026. [ECFs 21-22].

On February 3, 2026, MVL filed an unopposed motion to amend the schedule because it was "conferring [with the government] concerning potential settlement and [] discuss[ing] the completeness of the administrative record[,] . . . [which] necessitate[d] an enlargement of time[.]" [ECF 26] at 1-2. The Court granted MVL's motion and adopted the amended schedule on February 6, 2026. [ECF 27]. On February 24, 2026, MVL filed another motion to amend the schedule. [ECF 28]. In the motion, MVL stated as follows:

> On February 4, 2026, the government agreed to provide additional documents omitted from the administrative record. On February 12, 2026, [MVL] discovered that the government also failed to include the individual evaluator worksheets in the administrative record. The parties conferred and the government acknowledged the omission and promised to provide the same. On February 23, 2026, the government provided the [forty-eight] omitted worksheets. As of the date of this filing, the government has not yet provided the final certification of the completeness of the record.

*Id.* at 2. The Court granted the amended schedule on March 3, 2026. [ECF 29]. Thereafter, on March 6, 2026, the government filed the corrected administrative record. [ECF 30]. MVL filed another motion to amend the schedule on March 24, 2026, to allow additional time for the government "to formally correct the administrative record with the documents" related to the IGE. [ECF 31] at 2. The Court granted this motion on March 31, 2026. [ECF 32].

On April 8, 2026, MVL filed its MJAR, [ECF 34], and a motion to amend its complaint "to conform its bid protest complaint to the arguments in its [MJAR]," [ECF 33]. On April 23, 2026, the government filed an unopposed motion to correct the administrative record to include "missing documents . . . related to the [IGE]," [ECF 35] at 1, and an unopposed motion to amend

the schedule, [ECF 36]. The Court granted both unopposed motions on April 27, 2026. [ECF 37]. Thereafter, the government filed its cross-MJAR, [ECF 38], on May 8, 2026, and an unopposed motion to supplement the administrative record, [ECF 41], on May 28, 2026.[6] The MJARs are fully briefed, Pl.'s Reply & Resp. [ECF 39]; Def.'s Reply [ECF 42], and the Court held oral argument on June 3, 2026, *see* [ECF 37].[7]

## III. STANDARD OF REVIEW

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This waiver of sovereign immunity "covers a broad range of potential disputes arising during the course of the procurement process," including objections to an award decision by a federal agency. *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) (citations omitted). "When proceedings before an agency are relevant to a decision in a case, the administrative record of those proceedings must be . . . filed with the court." RCFC 52.1(a). Parties may then "file a[n] [MJAR] for the Court to assess whether [the agency], given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review." *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019) (citations omitted); *see also Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) ("In deciding [cross-motions under Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC")], the court considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006))). This procedure is "designed to provide for trial on a paper record, allowing fact-finding by the [] court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

When a party challenges an agency's contract award decision, the court reviews the decision using the standard of review set forth in the Administrative Procedure Act ("APA"), 28 U.S.C. § 1491(b)(4), which states that "the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." Section 706 provides that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "In applying the APA to protests . . . [the court] determine[s] whether '(1) the

---

[6] In its motion to supplement, the government seeks to "[s]upplement[] the administrative record with [AR] Tab 111's native Excel file . . . because metadata of [AR] Tab 111 is not addressed in the administrative record and is necessary so that the Court can conduct 'meaningful judicial review.'" [ECF 41] at 2-3 (quoting *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009)).

[7] On September 18, 2026, MVL filed a motion requesting that "the Court [] issue a [temporary restraining order] to prevent the [Air Force] from making three awards in excess of $35 million dollars without reasonable advance notice to MVL, in violation of the parties' agreement." [ECF 45] at 1. The government filed a response opposing the request on September 24, 2026, [ECF 49], in which "[t]he government assert[ed] that [such an order] would cause widespread logistical, regulatory, and mission-support harm to the United States, such that MVL cannot prevail on a balance of harms analysis, nor can MVL show that [such an order] is in the public interest," *id.* at 6. The government attached three declarations to its response. [ECFs 49-1, 49-2, 49-3]. The Court held a hearing on September 25, 2026. [ECF 48]. During the hearing, MVL voluntarily withdrew its request for a temporary restraining order.

procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 (Fed. Cir. 2004)); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that the court will not uphold an agency decision where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation . . . counter to the evidence before [it], or is so implausible [] it could not be ascribed to a difference in view or the product of agency expertise"). The standard of review is "highly deferential," *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000), however, "[w]henever a procurement decision is without a rational basis or is based upon a clear violation of law, that decision must be set aside," *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 376 (2011).

"[T]o prevail in a protest[,] the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted); *see also Bannum, Inc.*, 404 F.3d at 1351 (stating that "[a] bid protest proceeds in two steps," with the court first "determin[ing] whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract," and then "determin[ing], as a factual matter, if the bid protester was prejudiced by that conduct"). "[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Data Gen. Corp.*, 78 F.3d at 1562. A plaintiff must establish that an error was prejudicial before a court "set[s] aside a bid award, regardless of whether the error identified . . . was arbitrary and capricious action or . . . a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021) (citing *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 n.6 (Fed. Cir. 2021)). Accordingly, "there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision." *Id.* at 998.

## IV. DISCUSSION

MVL raises three challenges to the Air Force's price analysis. MVL argues that the Air Force relied upon an IGE that was not supported by the administrative record, that the Air Force conducted a flawed price reasonableness analysis, and that the Air Force failed to properly evaluate the offerors' proposals for unbalanced pricing. As explained below, the Court finds that while the Air Force's IGE was adequately supported, its price reasonableness analysis was arbitrary, and its unbalanced pricing analysis was arbitrary and contrary to law. The Court also finds that, despite establishing that the Air Force's flawed price reasonableness analysis was prejudicial, MVL has not done so for the Air Force's improper unbalanced pricing analysis.

### A. The Air Force's IGE was Adequately Supported

MVL argues that the IGE used by the Air Force to conduct its price reasonableness and unbalanced pricing analysis "is unsupported by the [] administrative record." [ECF 34] at 19 (emphasis omitted). It states that "after several requests . . . to correct the administrative record, [the Air Force] finally located and produced an Excel version of the IGE (which appears to be a

draft)," *id.* (citations omitted), and that "[i]n 'support' of the IGE, the [Air Force] included a September 2024 email thread ('C2E Pricing Model IGE') and an undated 'pricing research' spreadsheet, *id.* (citations omitted). According to MVL, the email thread "reveals that the [Air Force] immediately expressed a lack of confidence in the IGE, flagged the IGE as potentially problematic, and considered the rates used in the IGE to be 'really elevated.'" *Id.* at 19-20 (quoting AR 18213). MVL contends that the Air Force "seemingly based the IGE on '[Fiscal Year ("FY")]25 rates for current contractors that received recent modifications or [are] awaiting modifications,'" *id.* at 19 (quoting AR 18213), and that "[t]hese rates were supposedly compared against actual contractor rates from two distinct efforts . . . but the present administrative record fails to identify those efforts or describe how those efforts are similar to the solicited C2E effort," *id.* (citation omitted). MVL also argues that "absent from the record is documentation or analysis regarding how the [Air Force] prepared the IGE." *Id.* at 20.

In response, the government asserts that the "administrative record demonstrates that the IGE was rationally calculated," [ECF 38] at 23 (emphasis omitted), because "[t]he Air Force used the predecessor contract vehicles, the WE&C and RE&C, fully burdened labor rate[] obligations[,] . . . calculated the labor rates to create the IGE by using 'FY25 rates for current contractors that received recent modifications or [are] awaiting modifications' . . . [and] then used 'around [***]% of the high values of the senior level positions for each labor rate [in the IGE],'" *id.* (emphasis omitted) (quoting AR 18213). The government further asserts that "the calculated labor rates [are] explained by . . . the pricing research worksheet that the Air Force used to create the labor rates for the IGE." *Id.* The government states that "[t]he administrative record does not contain any notion that the labor rates used in the IGE were unreasonably high," *id.* at 25, and that MVL "fail[s] to adequately challenge the validity of the labor rates used in either RE&C and WE&C, or the Air Force's decision to use [***]% of the high rates of those contract vehicles," *id.* at 26.

The record shows that the Air Force's IGE has a rational basis. "[A]n IGE need not be supported with exhaustive details, [however,] the agency must be able to demonstrate the basis for the estimate, where . . . , the analysis is questioned." *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 594 (2003). The court must be able to establish a rational connection between the IGE and the administrative record to ensure that it does not contain irrational assumptions. *See id.* at 595 (citing *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 742 (2000)). Here, the Air Force's IGE is a completed Appendix L-08 Labor Rates Table, which consists of an FFP Labor Rates Excel sheet containing fully burdened labor rates for each labor category for FY 2025 through FY 2034, as well as labor rates for an option to extend the services. AR Tab 111. This is the same pricing format that the RFP required the offerors to use to submit their proposed pricing. *See* AR 1758, 1773, 1775 (requirement to submit proposed hourly labor rates for all labor categories in Section L Appendix L-08 Labor Rates Table). Using this format, the Air Force entered fully burdened labor rates for each labor category based on labor rate data from current contractors under the RE&C and WE&C contract vehicles, the predecessor contracts to the C2E contract. *See* AR 18215 (internal Air Force email requesting "an IGE from the tech/requirements team," explaining that "[t]he labor categories and hours are already there, so it is really just about inputting the [fully burdened labor rate] for each labor category and year," and stating that the requirements team has "historical data they can use"); AR 18214 (email response providing a document with FY 2025 and FY 2026 labor rate ranges from the

RE&C and WE&C contracts); AR 18213 (email explaining that the IGE is based on "FY25 rates for current contractors that received recent modifications or awaiting modifications" and that the labor rates "average around [***]% of the high values of the senior level positions for each labor rate"). This approach for developing the IGE is explained in the internal Air Force emails, AR Tab 110, and is further substantiated by the labor rates in the IGE, AR Tab 111, and the pricing research containing the FY 2025 labor rates from the predecessor contracts, AR Tab 112. With this evidence, the Court can establish a rational connection between the IGE and the administrative record. *See Nutech Laundry & Textile, Inc.*, 56 Fed. Cl. at 595; *see also Veteran Shredding, LLC v. United States*, 146 Fed. Cl. 543, 580 (2019) (finding that an agency does not need to support its IGE with notes or back-up documentation when the IGE is based on historical data), *aff'd*, 842 F. App'x 606 (Fed. Cir. 2021); *URS Fed. Servs., Inc. v. United States*, 142 Fed. Cl. 392, 406 (2019) (finding no requirement for agency "to produce . . . additional back-up documentation to support the rationality of [its IGE]" when the IGE is based on historical data and when the protester "does not challenge the validity of the numbers as accurate reflections of the historical data"); *MED Trends, Inc. v. United States*, 102 Fed. Cl. 1, 7 (2011) (finding agency use of an IGE prepared using historical data rational where "[t]he plaintiff has not demonstrated, or even alleged, that any of the[] particular figures were unreasonable or inaccurate[,] [n]or has it pointed to any authority for the proposition that the agency must provide a more detailed explanation of how its [IGE] was formulated").

The Court is not persuaded by MVL's argument that the Air Force expressed a lack of confidence in the IGE and considered the rates used in the IGE to be elevated. *See* [ECF 34] at 19-20. While the internal emails show that an Air Force project manager initially inquired into why the labor rates "seem really elevated" as compared to his calculations, AR 18213, the emails also show that the same person was satisfied with the explanation, AR 18212 (internal Air Force email stating "Gotcha. That makes sense. Comparing these rates to the ones I calculated they were all just below the highest rates that were offered in the RE[&]C and WE[&]C"). The Court is also not persuaded by MVL's argument that the record fails to describe how the RE&C and WE&C efforts are like the C2E effort. *See* [ECF 34] at 19. To the contrary, the record shows that the Air Force viewed the C2E MATOC as a follow-on to the RE&C and WE&C contracts to satisfy "existing/ongoing requirements." AR 473. Therefore, it was logical for the Air Force to use historical labor rates from these predecessor contracts for the purpose of developing an IGE.

### B. The Air Force's Price Reasonableness Analysis was Arbitrary

MVL argues that "[t]he [Air Force] has provided no rational basis for its determination that the [twelve] awardees offered fair and reasonable pricing, as required by the [RFP] and FAR 15.402(a)." [ECF 34] at 20. MVL contends that "the [RFP] stated that the [Air Force] would evaluate offerors' proposed TEPs for reasonableness using the techniques in FAR 15.404-1," *id.*, but the Air Force's attempt "to determine whether offerors' proposed prices were fair and reasonable by (1) comparing offerors' yearly TEPs against the yearly TEPs in [the] IGE; and (2) comparing offerors' overall TEPs against the 'average' overall TEP of the [sixteen] highest technically rated offerors and the overall TEP in the IGE" were both insufficient, *id.* at 21. First, because it alleges that the Air Force's IGE is unsupported, MVL asserts that "the Court cannot conclude that the [Air Force's] use of the IGE to support its price reasonableness determination was reasonable." *Id.* at 22. Next, because it alleges that the Air Force merely "documented the

difference (both in percentage and dollar amount) between each offeror's proposed TEP and the average . . . [and] stopped after listing the percentage of variance without any additional analysis," *id.* at 24 (emphasis omitted), MVL asserts that the Air Force failed to conduct a meaningful price analysis using the average TEP, *id.*

In response, the government states that "the administrative record establishes that the Air Force followed FAR 15.40[4]-1 in employing two price analysis techniques permitted by the FAR," [ECF 38] at 27, which "included comparing both the overall average TEP received of all [sixteen] of the [HTROs] to the offeror's proposed TEP, FAR 15.404-1(b)(2)(i), and comparing the offeror's proposed TEP to the government's IGE, [FAR] 15.404-1(b)(2)(v)," *id.* With respect to the Air Force's comparison of the proposed TEPs to the IGE, the government argues that "the IGE is sufficiently supported by the administrative record . . . [and that there is no support for MVL's argument] that because an IGE is higher than every offer[] received, . . . the IGE is irrational and should not be used in price reasonableness evaluation." *Id.* at 30. Next, with respect to the Air Force's comparison of an offeror's TEP to the average TEP, the government argues that "[t]he difference between certain offeror's prices received does not amount to such a difference that renders the agency's price reasonableness analysis arbitrary or capricious." *Id.* at 31. While "MVL identifies three offeror's prices higher than the average TEP, evidently implying that these offeror's prices are impermissibly high[,]" *id.*, "this Court has routinely upheld price premiums of the size of [these three offerors]," *id.* at 32. According to the government, "MVL's argument that those three offerors' prices were unreasonable because they were higher is simply an unsuccessful protestor seeking to substitute their evaluation for the agency['s]." *Id.*

The Court finds that, while the Air Force rationally relied on its IGE to determine price reasonableness, its price reasonableness analysis using the average TEP was arbitrary. To assess price reasonableness, the RFP stated that the Air Force "will evaluate the proposed [TEP] for reasonableness using the techniques described in FAR 15.404-1." AR 1639. The FAR provides that the contracting officer may use "[t]he analytical techniques and procedures described in [FAR 15.404-1] . . . , singly or in combination with others, to ensure that the final price is fair and reasonable." FAR 15.404-1(a)(1). "Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." FAR 15.404-1(b)(1). To conduct a price analysis, "[t]he [g]overnment may use various price analysis techniques and procedures to ensure a fair and reasonable price." FAR 15.404-1(b)(2). Such techniques and procedures include the "[c]omparison of proposed prices received in response to the solicitation[,] . . . [the] [c]omparison of the proposed prices to historical prices paid, whether by the [g]overnment or other than the [g]overnment, for the same or similar items[,] . . . [and the] [c]omparison of proposed prices with independent [g]overnment cost estimates[.]" FAR 14.404-1(b)(2)(i)-(ii), (v). "FAR 15.404-1 leaves the choice of price-analysis technique to a contracting officer's reasonable judgment in the context of an individual procurement." *DynCorp Int'l, LLC*, 10 F.4th at 1310.

The record in this case shows that the Air Force assessed price reasonableness using a combination of two techniques. It compared each offeror's proposed TEP to the IGE, and it compared each offeror's proposed TEP "to the average of the evaluated HTRO F&O proposed TEPs[.]" AR 16384 (price reasonableness assessment for Flatiron Dragados Constructors Inc.);

AR 16386 (same for Parsons Government Services Inc.); AR 16395 (same for Hensel Phelps Construction Co.); AR 16402 (same for MVL). In its price evaluation report, the Air Force used a nearly identical price reasonableness explanation for each offeror, which stated as follows:

> To assess fair and reasonableness, the price/cost analyst compared the proposed TEP of [the respective offeror] to the average of the evaluated HTRO F&O proposed TEPs of $[***] and to the IGE of $[***]. When compared to the average proposed TEPs, [the respective offeror's] proposal is [a percentage amount lower or higher] than the F&O HTRO average proposed TEPs; however, it is [a percentage amount] lower than the IGE. Therefore, it is determined [the respective offeror's] proposed TEP does not exceed the price a prudent person would pay in the conduct of competitive business and is determined to be fair and reasonable.

AR 16384; AR 16386; AR 16395-96; AR 16402-03. The Air Force also inserted a table summarizing its price reasonableness analysis by showing the dollar and percentage difference between each offeror's proposed TEP, the average TEP, and the IGE. AR 16369-70.

As explained above, the Air Force's IGE had a rational basis. Additionally, under the FAR, the contracting officer is permitted to establish price reasonableness by comparing the proposed prices to an IGE. FAR 15.404-1(b)(2)(v); *see also Dyncorp Int'l, LLC*, 10 F.4th at 1310 (the contracting officer has discretion to select price analysis technique). The fact that the IGE exceeds all the offerors' proposed prices does not itself render the IGE arbitrary. *See Quality Control Int'l, LLC v. United States*, 148 Fed. Cl. 425, 436 n.2 (2020) ("Even where *all* the offers received are significantly different from the IGE, that fact 'is not itself sufficient to establish the reasonableness of the bidders' prices and the unreasonableness of the government's estimate.'" (emphasis in *Quality Control Int'l, LLC*) (quoting *First Enter. v. United States*, 61 Fed. Cl. 109, 120 (2004))). Indeed, the purpose of a price reasonableness analysis is generally to determine whether the proposed price is too high. *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 21 (2012) (citations omitted). Here, because the IGE had a rational basis and the use of an IGE is a permissible price analysis technique under the FAR, the Air Force acted within its discretion when it determined that each offeror's proposed TEP was reasonable because it was lower than the IGE.

However, unlike the Air Force's comparison of the proposed TEPs to the IGE, its comparison of the proposed TEPs to the average TEP was not rational. Under the FAR, the contracting officer is permitted to establish price reasonableness by comparing the proposed prices received in response to the solicitation. FAR 15.404-1(b)(2)(i). To do so, the contracting officer must perform a comparison and then make an individualized determination that a price is fair and reasonable. *See Serco Inc. v. United States*, 81 Fed. Cl. 463, 495 (2008) ("[W]hile an agency may employ [] discretion in using a general analysis of prices to confirm the reasonableness of the price . . . , no amount of discretion gives it a license to use a generalized analysis of prices as a proxy for making an individualized determination that a given price is actually 'fair and reasonable.'"). In the instant case, the record shows that the Air Force performed calculations to determine the dollar and percentage differences between each offeror's

proposed TEP and the average TEP. AR 16369-70. However, the record does not show whether or how the Air Force used such information to determine that each proposed TEP was fair and reasonable. Merely documenting the difference between each offeror's proposed TEP and the average TEP without any additional analysis or explanation as to why such difference shows that a proposed price is reasonable "is inadequate for purposes of conducting a meaningful price reasonableness evaluation." *Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 336 (2020) (citing *Technatomy Corp. v. United States*, 144 Fed. Cl. 388, 390 (2019)).

The Court is not persuaded by the government's argument that "[t]he difference between certain offeror's prices received does not amount to such a difference that renders the agency's price reasonableness analysis arbitrary," [ECF 38] at 31, and that "this Court has routinely upheld price premiums of the size" at issue in this protest, *id.* at 32. To support this argument, the government relies on *AAR Government Services, Inc. v. United States*, 180 Fed. Cl. 587 (2026), and the collection of cases therein. *Id.* at 31-32 (citations omitted). However, in each of these cases, the contracting officer provided additional analysis and explanation to support their determination that the price premium was reasonable, such that the court was able to conclude that the price reasonableness analysis had a rational basis. *See AAR Gov't Servs., Inc.* 180 Fed. Cl. at 601; *Tolliver Grp., Inc. v. United States*, 172 Fed. Cl. 581, 597 (2024); *ASRC Fed. Tech. Sols., LLC v. United States*, 169 Fed. Cl. 372, 389-90 (2024); *AMES 1, LLC v. United States*, 162 Fed. Cl. 1, 25 (2022); *Partner 4 Recovery v. United States*, 141 Fed. Cl. 89, 131 (2018). Here, the record does not contain any analysis or explanation as to the reasonableness of the proposed TEPs that exceed the average TEP, so the Court is unable to find that the price premiums at issue are reasonable.

### C. The Air Force's Unbalanced Pricing Analysis was Arbitrary and Contrary to Law

MVL argues that the Air Force "failed to conduct an analysis of unbalanced pricing, in violation of the [RFP] and FAR 15.404-1(g)." [ECF 34] at 24. MVL asserts that the Air Force "failed to conduct the required [unbalanced pricing] analysis [because] [n]othing in the Price Evaluation Report suggests that the [Air Force] even considered looking at the labor rates proposed by offerors for each of the labor categories . . . to determine if the rates were unbalanced." *Id.* at 25. According to MVL, this shows that "the price analyst did not meaningfully assess whether some of the awardees' proposed labor rates for certain labor categories were significantly overstated, while others were significantly understated [and that,] [i]nstead the price analyst focused only on escalation rates across each year of the contract[.]" *Id.* MVL contends that "[t]his analysis is insufficient because it fails to identify unbalanced pricing—i.e., whether a proposal's pricing structure hides overstated or understated prices, creating risk for the government." *Id.* 25-26. Additionally, MVL argues that the Air Force violated FAR 15.404-1(g)(2) because it "found that some offerors' . . . prices created the 'appearance' of unbalanced pricing . . . [yet] failed to perform the required risk analyses." *Id.* at 26.

The government counters that "[t]he Air Force's price balance evaluation was rational," [ECF 38] at 34 (emphasis omitted), because it "informed offerors that [it] would evaluate TEP's to determine if an offeror was unbalanced by analyzing the escalation rates," *id.* at 35. The

government further argues that "[t]his Court's caselaw provides substantial support for the [Air Force's] decision for balance by examining escalation rates, rather than by analyzing line items." *Id.* at 37. The government contends that "the [RFP] did not require contractors to complete individual line items, nor did the [Air Force] state that it would evaluate each labor category independently," *id.* at 39, and that "[l]abor categories . . . do not meet [the FAR definition of line items] because they do not include delivery, inspection, acceptance, invoicing, or payment elements [and] are simply components of the offerors' internal pricing structure," *id.* Additionally, the government argues that the Air Force "was not required to conduct a risk assessment associated with unbalanced pricing because it concluded that all offeror[s'] price[s] [were] balanced." *Id.* at 41.[8]

The record shows that the Air Force failed to conduct an unbalanced pricing analysis of the proposed labor categories as required by FAR 15.404-1(g). The FAR states that "[u]nbalanced pricing may increase performance risk and could result in payment of unreasonably high prices." FAR 15.404-1(g)(1). It explains that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." *Id.*; *see also* AR 1639 (using the same language as FAR 15.404-1(g)(1) except adding the word "contract" before "line items"). FAR 15.404-1(g) provides the following:

> (2) All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer shall—
>
> > (i) Consider the risks to the [g]overnment associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

[8] The government also argues that MVL's unbalanced pricing argument should be waived because its "argument amounts to nothing more than an untimely challenge to the stated terms of Section M of the [RFP], which expressly stated that the [Air Force] may conduct a price balance analysis using this [escalation rate] technique." [ECF 38] at 39 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)). The Court is unpersuaded. Under *Blue & Gold Fleet, L.P. v. United States*, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest." 492 F.3d at 1313. "A defect in a solicitation is patent if it is an obvious omission, inconsistency, or discrepancy of significance . . . [that] could have been discovered by reasonable and customary care." *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020) (quoting *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312-13 (Fed. Cir. 2016)). Here, the RFP states that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one of more contract line items is significantly overstated or understated," AR 1639, and that "the government may also consider an offer unbalanced if there is a significant difference between proposed prices from year to year, including option years, such that they are above or below what would be considered a reasonable adjustment for inflation," *id.* This language did not inform offerors that the Air Force intended to only evaluate unbalanced pricing by reviewing escalation rates. Instead, the RFP substantially quotes the FAR regarding significant overstatement or understatement of line items, which informs offerors that the Air Force intended to evaluate unbalanced pricing by reviewing line items. *See* FAR 15-404-1(g)(2) (using the same language as the RFP except omitting the word "contract" before "line items"). Accordingly, MVL did not waive its unbalanced pricing argument.

(ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

(3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

Additionally, the RFP informed offerors that "[t]he government may [] consider an offer unbalanced if there is a significant difference between proposed prices from year to year, including option years, such that they are above or below what would be considered a reasonable adjustment for inflation." AR 1639.

Thus, as noted above, FAR 15.404-1(g)(2) requires that "[a]ll offers with separately priced line items . . . shall be analyzed to determine if the prices are unbalanced." Here, the labor categories and associated NTE FFP fully burdened labor rates provided by the offerors are "separately priced line items" which must be analyzed to determine if the prices are unbalanced. The term "line item" is defined as a "basic structural element in a procurement instrument that describes and organizes the required product or service for pricing, delivery, inspection, acceptance, invoicing, and payment." FAR 2.101 (definition of line item). This definition is not limited to contract line items. *See id.* According to the RFP, "the rates proposed by the offeror will become contractually binding NTE FFP fully burdened labor rates should the offeror be awarded a contract . . . [and] are ceiling rates [that] shall be utilized for future competitive task orders, single-source task orders, and task order modifications that utilize fixed-price pricing[.]" AR 1638. Accordingly, the basic structural element in the RFP that describes and organizes the required services for pricing, delivery, inspection, acceptance, invoicing and payment are the labor categories and associated labor rates. *See* FAR 2.101 (definition of line item). However, despite the FAR's requirement that the contracting officer conduct an unbalanced pricing analysis of the line item prices, the administrative record is devoid of any indication that the Air Force evaluated the labor rates for unbalanced pricing. *See generally* AR Tab 76 (Price Evaluation Report); AR Tab 92 (Final SSEB Report). Instead, the record shows that the Air Force's unbalanced pricing analysis consisted only of an examination of year-to-year TEP escalation over the period of performance. *See, e.g.*, AR 16382-83; AR 16385; AR 16394-95; AR 16401-02. Accordingly, the Air Force failed to comply with the FAR by not analyzing the labor rates. *See* FAR 15.404-1(g)(2); *see also Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 275 (2024) (finding that an agency's "limiting [of] its unbalanced-pricing analysis to a year-over-year comparison within each bid" to be irrational); *Crawford RealStreet Joint Venture*, B-415193.2 *et al.*, 2018 CPD ¶ 121, at *4-*5 (Comp. Gen. Apr. 2, 2018) (finding that government reasonably identified unbalanced pricing by analyzing labor rates).[9]

---

[9] The Court is not persuaded by the government's assertion that the labor categories "are simply components of the offerors' internal pricing structure." [ECF 38] at 39. The RFP explicitly states that "the [labor] rates proposed by the offeror will become *contractually binding NTE FFP fully burdened labor rates* should the offeror be awarded a contract . . . [that] *shall be utilized* for future competitive task orders, single-source task orders, and task order modifications that utilize fixed-price pricing[.]" AR 1638 (emphasis added). Thus, the labor categories are the "basic structural elements . . . that describe[] and organize[] the required . . . service for pricing, delivery, inspection, acceptance, invoicing and payment." FAR 2.101 (definition of line item). These labor categories and associated labor rates "will be incorporated into the [IDIQ] and used for task orders issued under the [IDIQ]." *Crawford*

The government argues that "[t]his Court's caselaw provides substantial support for the [Air Force's] decision for balance by examining escalation rates, rather than by analyzing line items." [ECF 38] at 37. To support this position, the government relies solely on *Munilla Construction Management, LLC v. United States*, 130 Fed. Cl. 635 (2017). *Id.* Specifically, the government contends that, "the Court in *Munilla*, determined that because the contract in that case was a solicitation involving a base year and options, that the agency's reliance on conducting a price balance evaluation by examining whether 'prices were unbalanced as between each of the performance periods set forth in the contract[]' was reasonable." *Id.* at 38 (quoting *Munilla Constr. Mgmt., LLC*, 130 Fed. Cl. at 651). However, the government's reliance on this case for the proposition that the Air Force may limit its unbalanced pricing analysis to an evaluation of escalation rates is misplaced. In *Munilla Constr. Mgmt., LLC*, the full quote that the government relies upon states that "the record [was] replete with evidence of the [agency's] consideration of individual [contract line items] in its discussion of whether the offerors' prices were unbalanced as between each of the performance periods set forth in the contract." *Munilla Constr. Mgmt., LLC*, 130 Fed. Cl. at 651. Additionally, "the [agency] created [a] six-page detailed abstract of proposals, which consisted of a table listing side-by-side each offeror's prices for each [contract line item] for the base year and each potential option year," *id.* (citations omitted), and the agency included a "narrative discussion of individual [contract line items] in its evaluation of whether the offerors' pricing proposals were unbalanced," *id.* Accordingly, while this case supports the proposition that an agency's unbalanced pricing analysis may include an assessment of year-to-year price escalation when the procurement includes a base year and option periods, it does not support the government's position that the Air Force was not obligated to analyze line items for unbalanced pricing.

Furthermore, the record shows that the Air Force failed to conduct the required risk analysis under FAR 15.404-1(g)(2) when its price analysis indicated that several of the offerors' proposed pricing was unbalanced. FAR 15.404-1(g)(2) states that, if price analysis techniques indicate that an offer is unbalanced, the contracting officer shall "consider the risks to the government associated with the unbalanced pricing . . . in making the source selection decision" and "consider whether the contract award will result in the government paying unreasonably high prices for contract performance." Here, in its Price Evaluation Report, the Air Force stated that "[t]o assess balance, the price/cost analyst calculated the rate increase from the [first] year of the base period, through each additional base year, each option period, and including a [six] month FAR 52.217-8 Option to Extend Services of the proposed rates[.]" AR 16382 (price balance assessment for Flatiron Dragados Constructors Inc.); AR 16385 (same for Parsons Government Services Inc.); AR 16394 (same for Hensel Phelps Construction Co.); AR 16401 (same for MVL). The Air Force further stated that "[b]ased on comparison to historical and projected rates utilizing the S&P Global, . . . the price cost analyst determined anything above an average increase of 3.50% created an appearance of unbalanced pricing which would require

---

*RealStreet Joint Venture*, 2018 CPD ¶ 121, at *4-*5. That the Air Force provided a fixed quantity of labor hours for each labor category and then multiplied that number by the proposed labor rates to establish each offeror's TEP does not change the fact that the labor categories are the "basic structural element" that describe and organize the required service for the purpose of establishing labor rates under the IDIQ. Moreover, this conclusion does not preclude subsequent task orders from using basic structural elements other than labor categories to describe and organize the required service or product to be procured by the Air Force.

further analysis." AR 16383; AR 16385; AR 16395; AR 16402. During its price evaluation, the Air Force identified seven offerors whose "proposed increases [were] above what would be considered acceptable and created an appearance of unbalanced pricing, requiring further analysis." AR 16376 (price balance assessment for CDM Constructors Inc.); AR 16383 (same for Flatiron Dragados Constructors Inc.); AR 16390 (same for BL Harbert International LLC); AR 16395 (same for Hensel Phelps Construction Co.); AR 16397 (same for HHI Corporation); AR 16402 (same for MVL); AR 16404 (same for Cadell-Enka, A Joint Venture). However, the record only shows that the Air Force considered whether a contract award to these offerors would result in the government paying unreasonably high prices by comparing the offerors' proposed prices to the IGE. AR 16376; AR 16383; AR 16390-91; AR 16395; AR 16397-98; AR 16402; AR 16404-05. There is no evidence that the Air Force considered the performance risks associated with the unbalanced pricing.[10] *See* FAR 15.404-1(g)(1) ("Unbalanced pricing may increase performance risk."); FAR 15.404-1(g)(2)(i) (requiring the government to consider the risks associated with the unbalanced pricing in making the source selection decision); *Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 240 (2020) ("In addition to price risk, agencies must assess the performance risk of proposals with unbalanced pricing."). This failure renders the Air Force's unbalanced pricing analysis arbitrary and contrary to law.

### D. The Air Force's Flawed Price Reasonableness Analysis was Prejudicial but Its Flawed Unbalanced Pricing Analysis was Not

MVL argues that the Air Force's "failure to conduct a reasonable price analysis prejudiced all offerors—including MVL—because it impacted the [Air Force's] decision as to which offerors to award contracts to." [ECF 34] at 26. It asserts that "[h]ad the [Air Force] meaningfully evaluated offerors' TEPs for reasonableness and assessed whether offerors' proposed labor rates presented an indication of unbalanced pricing, . . . the [Air Force's] source selection decision could have been different." *Id.* MVL contends that had the Air Force properly conducted a price analysis it "may have concluded that the offerors with the highest overall proposed TEPs—Parsons, Flatiron, and Hensel Phelps—were not 'fair and reasonable[.]'" *Id.* at 27. MVL further contends that had the Air Force "meaningfully assessed whether offerors' proposed labor rates presented unbalanced pricing[,] . . . it is possible the [Air Force] could have identified materially unbalanced pricing, . . . which could ultimately lead to the conclusion that contract awards to certain offerors would result in the government paying unreasonably high prices for task order performance." *Id.* (emphasis omitted). MVL states that it "offered a lower overall TEP compared to Parsons, Flatiron, and Hensel Phelps[.]" *Id.*

[10] The Court is not persuaded by the government's argument that the Air Force "was not required to conduct a risk assessment associated with unbalanced pricing because it concluded that all offeror[s'] price[s] [were] balanced." [ECF 38] at 41. Rather, the record shows that the Air Force determined that the year-to-year increase for seven offerors "created an appearance of unbalanced pricing, requiring further analysis." AR 16376. The Air Force then "did a further comparison of the proposed prices to the IGE from the base year through the . . . [o]ption" and determined that "[t]he comparison to the IGE showed that the proposed prices are consistently below the IGE." *Id.* While this "further analysis" might have addressed the price risk caused by the unbalanced pricing and supported a decision to accept such risk, it does not render the pricing balanced. Therefore, the Air Force's conclusion that "the proposal is balanced" is arbitrary. *Id.* The Air Force applied this same explanation for each of the seven offerors. *See* AR 16376; AR 16383; AR 16390; AR 16395; AR 16397; AR 16402; AR 16404.

The government argues "that MVL has failed to identify with any specificity a claim of error regarding the Air Force's price reasonableness analysis that amounts to a prejudicial error." [ECF 38] at 32. It states that "MVL must establish that but for the error, MVL would have been among the top [twelve] offerors" for the error to be prejudicial. *Id.* at 33. The government contends that "MVL has failed to establish that [it would have been among the top twelve offerors, and] instead mak[es] generalized arguments that the [Air Force's] price reasonableness evaluation was inadequate." *Id.* According to the government, while "MVL argues that because [] three offerors had higher prices than the average of all TEPs, [] this is somehow evidence that their prices are unreasonable[;] [c]onveniently, excluded from MVL's argument, is that MVL itself had a higher price than the average of the TEPs." *Id.* Additionally, the government contends that "MVL has not identified any prejudicial error that would entitle MVL to success in this bid protest regarding MVL's price balance argument." *Id.* at 42. It argues that "MVL has not identified a single labor rate that is apparently significantly overstated or understated in any offer[]." *Id.* (emphasis and citation omitted). The government further contends that MVL's statement that "it is possible that the [Air Force] could have identified materially unbalanced pricing," *id.* (quoting [ECF 32] at 24), "is a far cry from establishing that 'but for' the Air Force's alleged error, MVL would have placed among the top [twelve] offerors to be awarded the contract," *id.* at 42-43 (citation omitted).

The Court finds that MVL has established that the Air Force's flawed price reasonableness analysis was prejudicial but that it has failed to establish the same with respect to the Air Force's improper unbalanced pricing analysis. "The requirement to determine whether an agency's error was prejudicial to the plaintiff 'is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law.'" *Superior Waste Mgmt. LLC*, 169 Fed. Cl. at 275 (quoting *Sys. Stud. & Simulation, Inc.*, 22 F.4th at 996-97). "'To establish prejudicial error,' a party must show that 'but for the error, it would have had a substantial chance of securing the contract.'" *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (quoting *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009)), *cert. denied*, 142 S. Ct. 68 (2021) (mem.). "Put another way, to show prejudice a disappointed bidder needs to show that 'it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest.'" *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

MVL has shown that the Air Force's flawed price reasonableness analysis was prejudicial. Based on the Air Force's evaluation of the final proposal revisions, MVL finished fourteenth out of sixteen offerors. *See* AR 18078. Under the RFP, the Air Force issued contract awards to the top twelve offerors. AR 1633; AR 16446. Therefore, for MVL to demonstrate prejudice, it needs to show that, but for the flawed price reasonableness analysis, MVL would have a greater than insubstantial chance of finishing in the top twelve. To do so, MVL identifies three offerors that finished within the top twelve despite proposing higher overall TEPs than MVL: Parsons Government Services, Inc., Flatiron Dragados Constructors Inc., and Hensel Phelps Construction Co. [ECF 34] at 27. MVL has also shown that each of these offerors proposed TEPs that exceeded the average TEP by percentage amounts greater than that of MVL's TEP. *See* AR 16369-70. The record shows that Parsons' TEP exceeded the average TEP by [***]%, Flatiron's TEP exceeded the average TEP by [***]%, and Hensel Phelps' TEP

exceeded the average TEP by [***]%, while MVL's TEP exceeded the average TEP by [***]%. AR 16370. Had the Air Force properly conducted an analysis of each offeror's proposed TEP against the average TEP and explained whether and how a proposed TEP that exceeds the average TEP still represents a fair and reasonable price, there is a greater than an insubstantial chance that the Air Force would find that the proposed TEPs of two or more of these offerors was unreasonable, which would have resulted in MVL finishing in the top twelve offerors.

However, MVL has not shown that the Air Force's improper unbalanced pricing analysis was prejudicial. First, with respect to the Air Force's failure to analyze each offeror's proposed labor rates, MVL fails to identify a single example of another offeror's proposed labor rate that could be found significantly over or understated to be considered unbalanced. *See* FAR 15.404-1(g)(1). Instead, MVL generally asserts that "it is possible the [Air Force] could have identified materially unbalanced pricing." [ECF 34] at 27. Without more, this only establishes "a 'mere possibility' that but for the [Air Force's] errors, [MVL] 'would have received the contract.'" *AM Gen. LLC v. United States*, 115 Fed. Cl. 653, 702 (2014) (quoting *Data Gen. Corp.*, 78 F.3d at 1562). This is insufficient to establish prejudice. Moreover, in its reply, MVL states in conclusory fashion that, "[b]ecause MVL has shown that the [Air Force] failed to perform an unbalanced pricing analysis, it has suffered the requisite prejudice." [ECF 39] at 24. However, MVL has the burden to establish prejudice. *Data Gen. Corp.*, 78 F.3d at 1562 (explaining that "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it"). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision." *Sys. Stud. & Simulation, Inc.*, 22 F.4th at 998.

Next, with respect to the Air Force's failure to conduct the required risk analysis, MVL was one of the seven offerors that the Air Force identified as having a proposed "average [rate] increase[] . . . [that was] above what would be considered a reasonable adjustment for inflation and [that] created an appearance of unbalanced pricing, requiring further analysis." AR 18118. Additionally, MVL's proposed average rate increase of [***]% was the highest of all the offerors' proposed escalation rates.[11] *Compare* AR 18118 (average rate increase for MVL) *with* AR 18079 (same for ECC Expeditionary Constructors LLC); AR 18081 (same for Tutor Perini Corporation); AR 18084 (same for Gilbane Federal JV); AR 18086 (same for CDM Constructors Inc.); AR 18089 (same for Contrack Watts Inc.); AR 18092 (same for Bering-Weston JV, LLC); AR 18096 (same for Flatiron Dragados Constructors Inc.); AR 18099 (same for Parsons Government Services Inc.); AR 18102 (same for CMS COLAS Construction LLC); AR 18106 (same for BL Harbert International LLC); AR 18108 (same for SLSCO, Ltd.); AR 18111 (same for Hensel Phelps Construction Co.); AR 18113 (same for HHI Corporation); AR 18124 (same for Exp Federal Inc.); AR 18132 (same for Caddell-Enka, A Joint Venture). Therefore, MVL likely benefited from the Air Force's failure to conduct the required risk analysis, as opposed to being prejudiced by it. *G4S Secure Integration LLC v. United States*, No. 21-1817, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022) ("There has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited."), *appeal dismissed*, No. 2022-1513, 2023 WL 316142 (Fed. Cir. Jan. 19, 2023).

---

[11] Flatiron Dragados Constructors Inc.'s "average proposed [rate] increases range[d] from [***]% to [***]%[.] AR 18096.

### E. MVL is Entitled to Tailored Injunctive Relief

MVL requests that the Court "permanently enjoin the [Air Force] from issuing task orders and commencing performance under the MATOC . . . and order the [Air Force] to reevaluate the price proposals of the 16 offerors in the competitive range and issue a new source selection decision." [ECF 34] at 30. The Tucker Act empowers the Court to "award any relief that the court considers proper, including declaratory and injunctive relief[.]" 28 U.S.C. § 1491(b)(2). "Where a plaintiff has succeeded on the merits, the trial court is not required to issue injunctive relief." *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 321 (2022) (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 193 (1978)). "To determine if a permanent injunction is warranted, the court must consider whether (1) the [protester] has succeeded on the merits, (2) the [protester] will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC,* 389 F.3d at 1228-29). However, "even when the government's compliance with law is at stake, there is no presumption favoring the issuance of injunctive relief[.]" *IAP Worldwide Servs., Inc.*, 159 Fed. Cl. at 322. "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). "[I]f the record before the agency does not support the agency action . . . , or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 370 (second alteration in *AshBritt, Inc.*) (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)), *opinion clarified*, 87 Fed. Cl. 654 (2009).

Here, MVL has succeeded on the merits of its challenge to the Air Force's price reasonableness analysis by demonstrating that the Air Force failed to analyze and explain how each of the offeror's TEPs that exceeded the average TEP was determined to be fair and reasonable. Therefore, the Court must consider whether MVL will suffer irreparable harm in the absence of an injunction, whether the balance of hardships favors granting an injunction, and whether the public interest is served by an injunction. *See Contracting, Consulting, Eng'g LLC v. United States,* 104 Fed. Cl. 334, 353 (2012) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well." (citing *PGBA, LLC*, 389 F.3d at 1226, 1228-29)).

The Court finds that the equitable factors weigh in favor of narrowly tailored injunctive relief. MVL will suffer irreparable harm without an injunction because there is no adequate alternative remedy for its lost opportunity to be fairly considered for the award of an IDIQ contract under the C2E MATOC and to compete for future task order awards. *See Insight Sys. Corp. v. United States,* 110 Fed. Cl. 564, 582 (2013) ("When assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" (alteration in *Insight Sys. Corp.*) (quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993))); *see also Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 34 (2022) (collecting cases for the well-established principle that, while not a *per se* rule, deprivation of an opportunity to fairly compete for contract award and the potential lost

profits associated with such lost opportunity are often sufficient to constitute irreparable injury); *KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 362-63 (2015)) (finding that lost opportunity to compete for future task orders will cause irreparable harm (citing *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 115-16 (2013))).

However, the balance of hardships weighs in the government's favor. MVL argues that "[t]he balance of hardships [] weighs in favor of issuing a permanent injunction as the harm to MVL outweighs any potential burden imposed on the [Air Force] [because] [p]erformance of the disputed MATOC is currently stayed and the [Air Force] has claimed no harm to date." [ECF 34] at 29-30. The government argues that it "will suffer hardship should the Court grant injunctive relief." [ECF 38] at 44 (citation omitted). To support its position, the government provides a declaration by the contracting officer for the C2E MATOC. [ECF 38-1] at 1. In the declaration, the contracting officer represents that "[***]." *Id.* at 2. The contracting officer also provides various examples of CONUS and OCONUS projects that would be critically impacted by an injunction of the C2E MATOC, *id.* at 2-5, and explains that "[***]," *id.* at 6. The contracting officer further explains that "[***]," *id.* at 6, and that "[***]," *id.*

The Court is required to "give due regard to the interests of national defense and national security," 28 U.S.C. § 1491(b)(3), in exercising its jurisdiction over bid protests. On this record, the harm to the government in enjoining the Air Force from commencing performance and issuing task orders under the C2E MATOC outweighs the harm to MVL, namely its inability to compete for task orders during the pendency of a remand to the Air Force to perform the missing price reasonableness analysis. Furthermore, an injunction that prohibits the government from utilizing the C2E MATOC would be inconsistent with the status quo during the course of this protest, as MVL agreed to allow the Air Force to proceed with performance under the C2E MATOC subject only to receiving notice from the Air Force if it intended to award a task order greater than thirty-five million dollars to an F&O competition C2E MATOC awardee. [ECF 14] at 2. Nevertheless, this does not preclude the Court from issuing the "less intrusive equitable relief," *IAP Worldwide Servs., Inc.*, 159 Fed. Cl. at 325, requested by MVL.

Lastly, the public interest weighs in MVL's favor because "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA, LLC v. United States,* 57 Fed. Cl. 655, 663 (2003) (citations omitted); *accord Magellan Corp.*, 27 Fed. Cl. at 448 ("The public has an interest in honest, open and fair competition, and if [protester] is improperly excluded, that interest is compromised."). Though this factor "do[es] not shed a great deal of light on the result" because there is also a public interest in ensuring that the government is able "to conduct procurements expeditiously and with as little judicial intrusion as possible." *Magellan Corp.*, 27 Fed. Cl. at 448.

Upon balancing the equitable factors and considering the effects of the requested injunctive relief on MVL and the government, the Court concludes that narrowly tailored injunctive relief that consists of an expedited remand to the Air Force to conduct the missing price reasonableness analysis is appropriate. *See IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 412 (2021) ("[A] remand is particularly appropriate to allow the [agency] to perform the missing analysis, allow appropriate officials to review it, prepare new decision

documents, and move this action to an efficient resolution."); *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 90 (2022) (holding that the protester did "not demonstrate[] irreparable harm of a sufficient nature to justify vacating the [agency's] contract award" but that the protester had "demonstrated sufficient prejudice to support a remand"). MVL's primary harm is the lost opportunity to be fairly considered for an award under the C2E MATOC and to be able to compete for future task orders. A remand that requires the Air Force to correct its error in an expedited manner will remedy this harm and avoid unnecessary judicial intrusion into the Air Force's critical procurement activities under the C2E MATOC.

## V. CONCLUSION

For the reasons stated above, MVL's MJAR, [ECF 34], is **GRANTED-IN-PART** and **DENIED-IN-PART**. It is **GRANTED** with respect to its claim that the Air Force improperly conducted its price reasonableness analysis. It is **DENIED** with respect to its claims that the Air Force's IGE is not adequately supported by the administrative record and that the Air Force improperly conducted an unbalanced pricing analysis. The government's cross-MJAR, [ECF 38], is also **GRANTED-IN-PART** and **DENIED-IN-PART**. Additionally, the Court **GRANTS** MVL's motion to amend its complaint, [ECF 33], and the government's unopposed motion to supplement the administrative record, [ECF 41].

Pursuant to RCFC 52.2, this case is **REMANDED** to the Air Force to correct the flawed price reasonableness analysis consistent with this Opinion and Order. The Air Force is **ENJOINED** to complete its actions on remand in an expedited manner. In this regard, the government **SHALL FILE** a notice with the Court **on or before October 2, 2026**, advising the Court when it will complete its actions on remand and when it will share the results and any associated decisional documents with MVL. This case shall be **STAYED** during the remand.

Additionally, consistent with the agreement reached by MVL and the government as communicated to the Court via e-mail on September 28, 2026, during the pendency of the remand, the government stipulates to the following:

1. Notwithstanding the three following task orders: [***], no further task orders under the F&O C2E MATOC will be awarded;

2. The Air Force will not solicit further task orders under the F&O C2E MATOC; and

3. The government **SHALL FILE** a notice with the Court **on or before October 7, 2026**, advising whether there are any outstanding requests for proposals that have been issued with respect to task orders anticipated to be awarded under the C2E MATOC. The parties **SHALL MEET AND CONFER on or before October 15, 2026**, with respect to those requests for proposals.

Notwithstanding RCFC 52.2(b)(2), counsel of record for the government **SHALL PROVIDE** a copy of this Opinion and Order to the United States Air Force, which will constitute service pursuant to that Rule.

Some information contained in this Opinion and Order may be considered protected information subject to the protective order, [ECF 18], entered on December 12, 2025. Accordingly, the Opinion and Order is **FILED UNDER SEAL**. The parties **SHALL FILE by no later than October 7, 2026**, a joint status report that identifies information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order.

Additionally, the parties have not complied with their obligation to file redacted versions of their own filings. *See* [ECF 18] ¶ 12. The parties are **ORDERED** to file the required redacted versions **on or before October 23, 2026**.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge